UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

SCOTT WEAVER, Individually and
on Behalf of All Others Similarly Situated,

Plaintiff,

v. Case No. 2:18-cv-1996-JPS

CHAMPION PETFOODS USA INC. and
CHAMPION PETFOODS LP,

Defendants.

---

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND EXHIBITS IN SUPPORT THEREOF**

---

Pursuant to Federal Rule of Civil Procedure 56 and Eastern District of Wisconsin Local Rule 56, Defendants Champion Petfoods USA, Inc. and Champion Petfoods LP (collectively "Champion") hereby submits their Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment and Exhibits in Support Thereof.

1. Champion was founded in 1975 and initially produced the ACANA brand, which was similar to traditional dry kibble pet food. Declaration of Chinedu Ogbonna, ("Ogbonna Dec.") attached hereto as Exhibit 1, at ¶ 7.

2. In approximately 2005, Champion developed its ORIJEN brand, which is based on a Biologically Appropriate nutritional philosophy, which uses animal-based proteins to attempt to mirror how wolves or wilds dogs would get nutrition in nature. Deposition of Peter Muhlenfeld ("Muhlenfeld Dep."), attached hereto as Exhibit 2, at 136:17-147:19; Ogbonna Dec. at ¶ 7.

Subsequently, ACANA adopted this nutritional philosophy and modified its formulas accordingly. Muhlenfeld Dep. at 136:17-23; Ogbonna Dec. at ¶ 7.

3. Champion sells a wide variety of pet food diets under its brand names ORIJEN and ACANA. Third Amended Complaint ("TAC") ¶ 25.

4. For many years, Champion manufactured all of its dog food out of its NorthStar kitchen, in Morinville, Canada. Declaration of Christopher Milam, ("Milam Dec."), attached hereto as Exhibit 3, at ¶ 8.

5. In January of 2016, Champion opened its new DogStar kitchen in Auburn, Kentucky and slowly transitioned the manufacturing of its dog food sold in the United States to its new DogStar kitchen, with the exception of the diet ORIJEN Tundra, which has always been manufactured at NorthStar, and the exception of the state of Alaska, which has always received dog food manufactured at NorthStar. Deposition of Erik Flakstad ("Flakstad Dep."), attached hereto as Exhibit 4, at 102:6-103:25; Milam Dec. at ¶ 9.

6. Because Plaintiff purchased ORIJEN from early 2008 to approximately August 2017, he would have purchased diets produced at both Champion's NorthStar then DogStar Kitchens. Milam Dec. at ¶¶ 8-9; JSMF at ¶¶ 6, 8.

7. In approximately August of 2017, Plaintiff transitioned his dogs from Champion dog food to Purina Pro Plan. Deposition of Plaintiff Scott Weaver ("Weaver Dep."), attached hereto as Exhibit 5, at 45:13-22; TAC ¶ 21. Purina Pro Plan dog food contains some chick, but primarily consists of ground rice, whole grain wheat, corn gluten meal, whole grain corn, and a long list of vitamins and other supplements, as reflected by its ingredient panel. Weaver Dep., Ex. 7.

8. Plaintiff contradicted himself on when he stopped purchasing Champion's dog food. Complaint [DE 002] at ¶ 17; First Amended Complaint [DE 015] at ¶ 19; Second Amended Complaint [DE 023] at ¶ 20; Responses to Defendants' First Set of Interrogatories, attached hereto as Exhibit 6 (stating he stopped purchasing Champion's dog food in October 2017); Weaver Dep. 45:23-46:7; 67:3-9 (stating he stopped purchasing Champion's dog food in April or May of 2018); Letter from Plaintiff's counsel after deposition, attached hereto as Exhibit 7 (stating he stopped purchasing Champion's dog food in March 2018); WEAVER000010-11 attached hereto as Exhibit 8 (stating he stopped purchasing Champion's dog food and began purchasing Purina's dog food in July 2017); TAC ¶ 21 (stating he stopped purchasing Champion's dog food in August 2017).

9. Plaintiff's dog Prince Harry is healthy. Weaver Dep. 98:8-9. Plaintiff's dogs Jack and Jill died from cancer. Weaver Dep. 22:10-13. There is no evidence that the dogs' deaths were caused by the consumption of ORIJEN. Declaration of Robert H. Poppenga, DVM, PhD, DABVT ("Poppenga Dec."), attached hereto as Exhibit 9, at Ex. A at 34-35; Weaver Dep. 28:21-24; 57:10-12; 79:7-9.

10. Plaintiff never purchased an ACANA diet or any other ORIJEN diet. Weaver Dep. 44:20-45:7.

11. During the period of time that Plaintiff purchased ORIJEN Regional Red and ORIJEN Six Fish dog food from both the NorthStar and DogStar kitchens, Champion's ORIJEN Regional Red and ORIJEN Six dog food packages contained the statement "Biologically Appropriate Dog Food." Ogbonna Dec. at ¶¶ 9-10, Ex. A-D.[1]

---

[1] Digital images of the dog food packaging that Plaintiff purchased can be found in Exhibits A-D to the Declaration of Chinedu Ogbonna, attached hereto as Exhibit 1.

12. The NorthStar packaging of ORIJEN Regional Red and ORIJEN Six Fish dog food during the period of time that Plaintiff purchased these diets, states: "Here at Champion, our mission is clear and strong; we make Biologically Appropriate Dog and Cat foods." Ogbonna Dec. at ¶¶ 9-10, Ex. B, D.

13. The DogStar packaging of ORIJEN Regional Red and ORIJEN Six Fish dog food during the period of time that Plaintiff purchased these diets, states the dog food "mirrors the richness, freshness and variety of WholePrey meats that dogs are evolved to eat," that the food is "protein rich [and] carbohydrate limited, and "modern dogs are built like their ancestors [wolves]. Possessing a biological need for a diet that's rich and varied in animal protein." Ogbonna Dec. at ¶¶ 9-10, Ex. A, C. And the DogStar bags at issue explain: "Biologically Appropriate—Protein Rich, Carbohydrate Limited." *Id.*







14. Peter Muhlenfeld, Champion's former Chief Brand Officer, testified at his deposition that '"[w]e follow what's the most appropriate thing biologically. It's not biologically perfect by the way, it's biologically appropriate." Muhlenfeld Dep. at 120:7-10. Mr. Muhlenfeld also testified at his deposition: "So biologically – the philosophy of biologically appropriate is to get as close to the natural diet as possible." *Id.* 154:1-3; *see* 136:17-147:19.

15. Although the statements on Champion's packaging vary by diet and other factors, Champion marketed the diets purchased by Plaintiff as containing "fresh" and "regional" ingredients and being "Never Outsourced." Ogbonna Dec. at ¶¶ 9-10, Ex. A-D.

16. On the front of the NorthStar packaging for ORIJEN Regional Red, it states that the diet includes "regional red meat," and on the back of the packaging, it states that the diet includes "fresh regional ingredients." Ogbonna Dec. at ¶ 10, Ex. D. It further states "Canada's vast and unspoiled lands – our source of inspiration and fresh regional ingredients." *Id.*

17. On the front of DogStar's ORIJEN Regional Red packaging, it states that the diet is "made with regional ingredients delivered fresh or raw daily; Angus Beef, Suffolk Lamb, Mutton, Wild Catfish, Yorkshire Pork, and Boer Goat." Ogbonna Dec. at ¶ 10, Ex. C. The back of the DogStar Regional Red during the period of time that Plaintiff purchased these diets, states that the "Angus Beef, Suffolk Lamb, Yorkshire Pork, and Boer Goat," are "grass-fed on Kentucky ranches and delivered fresh or raw, in richly nourishing WholePrey ratios." *Id.*

18. On the front of the NorthStar ORIJEN Six Fish packaging, it states that the diet is "made with wild-caught regional saltwater and freshwater fish," and on the back of the packaging, it states that the diet includes "fresh regional ingredients." Ogbonna Dec. at ¶ 9, Ex. B.

19. The DogStar packaging of ORIJEN Six Fish packaging during the period of time that Plaintiff purchased these diets, states that the diet is "made with six wild and sustainably caught fish delivered daily; New England Herring, Flounder, Mackerel, Redfish, Monkfish, and Alaskan Cod." Ogbonna Dec. at ¶ 9, Ex. A. The back of the DogStar packaging of ORIJEN Six Fish during the period of time that Plaintiff purchased these diets, states it contains "unmatched inclusions of wild caught fish – whisked to our kitchens from cold New England waters Fresh or

Raw, in richly nourishing WholePrey ratios." *Id.* It further states "New England's vast Atlantic waters – our source of inspiration and fresh regional fish." *Id.*

20. The back of the packaging for both the ORIJEN Regional Red and ORIJEN Six Fish manufactured at DogStar during the period of time that Plaintiff purchased these diets, states that fresh and regional means Champion is "focus[ed] on local ingredients that are ethically raised by the people we know and trust, and delivered to our kitchens fresh or raw each day." Ogbonna Dec. at ¶¶ 9-10, Ex. A, C.

21. None of Champion's packaging for ORIJEN Regional Red or ORIJEN Six Fish states that 100%, each, or all ingredients are regional or fresh. Ogbonna Dec. at ¶¶ 9-10, Ex. A-D.

22. Champion never stated on its NorthStar or DogStar packaging of ORIJEN Regional Red or Six Fish that its dog food only contains "fresh" ingredients, that the ingredients are "all fresh," were "never frozen," or anything of the like. Weaver Dep. 76:10-14; Ogbonna Dec. at ¶¶ 9-10, Ex. A-D.

23. The front of packaging for the DogStar ORIJEN Regional Red diet and ORIJEN Six Fish diet purchased by Plaintiff clearly state that the diets include "freeze-dried tripe" and "freeze-dried liver," respectively. Weaver Dep. 74:8-25; Ogbonna Dec. at ¶¶ 9-10, Ex. A, C.

24. Plaintiff testified that the fact that freezing was used "wouldn't be a problem for [him]." Weaver Dep. 75:5-7.

25. The back of the DogStar packaging of ORIJEN Six Fish during the period of time that Plaintiff purchased these diets, which contains what Champion calls "Meat Math" and states "this 13 lb package of ORIJEN is made with over 11 lbs of fresh, raw, or dehydrated fish ingredients," and identifies these ingredients as Wild Atlantic Herring, Wild Yellowtail Flounder, Wild Atlantic Mackerel, Wild Acadian Redfish, Wild Monkfish, and Wild Alaskan Cod."

Ogbonna Dec. at ¶ 9, Ex. A. As Plaintiff acknowledged at his deposition, this leaves room for about 2 pounds of non-fresh ingredients. Weaver Dep. 77:21-78:2.




26. The DogStar ORIJEN Regional Red packaging states that 11 pounds of its 13-pound package are fresh or raw ingredients, and the packaging further states that the top ten ingredients are delivered fresh or raw. Ogbonna Dec. at ¶ 10, Ex. C.




27. The NorthStar ORIJEN Six Fish package states it is "made with wild-caught regional saltwater and freshwater fish." Ogbonna Dec. at ¶ 7, Ex. B.

28. The NorthStar package of Regional Red states the formula "features unmatched inclusions of ranch-raised Black Angus beef, wild boar, lamb, heritage pork and bison …. delivered fresh." Ogbonna Dec. at ¶ 10, Ex. D.

29. On the ORIJEN Regional Red and ORIJEN Six Fish packaging from NorthStar, it states on the back that "Quality is Never Outsourced" and explains that "we prepare ORIJEN ourselves, in our award-winning kitchens—so we know exactly what goes into each and every morsel." Ogbonna Dec. at ¶¶ 9-10, Ex. B, D.

30. On the ORIJEN Regional Red and ORIJEN Six Fish packaging from DogStar, the package states "NEVER OUTSOURCED. PREPARED EXCLUSIVELY IN OUR DOGSTAR® KITCHENS - We don't make foods for other companies and we don't allow our foods to be made by anyone else." Ogbonna Dec. at ¶¶ 9-10, Ex. A, C.




31. Plaintiff testified that he understood that "never outsourced" "means that they make it themselves, and they don't make it – have somebody else make it for them in a big mill somewhere." Weaver Dep. 85:17-21. When asked if "never outsourced" referred to the finished food product, Plaintiff stated "yes." *Id.* at 85:24.

32. On the packaging for ORIJEN Regional Red and Six Fish manufactured at both NorthStar and DogStar, Champion includes exemplar pictures of some of its ingredient suppliers. Ogbonna Dec. at ¶¶ 9-10, Ex. A-D.

33. The statements (x) "Made with Fresh and Natural Ingredients;" and (xxii) "Unmatched regional ingredients delivered fresh" in the TAC do not appear any of the bags of the ORIJEN diets that Plaintiff purchased. Ogbonna Dec. at ¶¶ 9-10, 19, Ex. A-D.

34. The statements (iii) "excluding…anything else that nature didn't intend your dog to eat" and (iv) "Virtually All of the Nutrients in ACANA are Natural and Not Synthetic" in the TAC appear only on the brochure cited to in the TAC, and do not appear on any of the bags of the ORIJEN diets that Plaintiff purchased. Ogbonna Dec. at ¶¶ 9-10, 20, Ex. A-D.

35. Plaintiff testified that he did not read any of Champion's brochures. Weaver Dep. 43:11-13.

36. The following statements in the TAC only appeared on one of Champion's websites, and do not appear on any of the bags of the ORIJEN diets that Plaintiff purchased: (xi) "USA DogStar kitchens, ingredients, processes, and foods all meet the strictest European Union standards – which are stricter than those set by AAFCO, the Canadian Food Inspection Agency, of FDA", (xii) "Unmatched by any other pet food maker anywhere in the world, our kitchens meet the strictest standards in the world, including the Government of Canada, and the European Union"; (xiv) "We prepare ACANA ourselves, in our own kitchens, where we oversee every detail of food preparation- from where our ingredients come from, to every cooking, quality and food safety process"; (xv) "Dogstar Kitchens have access to a myriad of specialty family farms, with whom we partner for our supply of trusted ingredients"; (xvi) "Are the most advanced pet food kitchens on earth, with standards that rival the human food processing industry for authenticity, nutritional integrity, and food safety"; (xvii) "Feature state-of-the-art fresh food processing technologies"; (xviii) "Feature unmatched and unique inclusions of meat, naturally providing everything your dog or cat needs to thrive." Ogbonna Dec. at ¶¶ 9-10, 21, Ex. A-D.

37. Plaintiff testified that he did not visit Champion's website prior to making any of his purchases of Champion's dog food. Weaver Dep. 36:1-9; 43:19-24.

38. Plaintiff testified he did not read Champion's White Paper. 37:6-9.

39. Heavy metals, such as arsenic, cadmium, lead, and mercury, are naturally occurring substances that are ubiquitous in the environment and commonly found in dog food. Poppenga Dec. at Ex. A at 3-5, 35.

40. The trace levels of heavy metals in Champion's dog food are naturally occurring within the natural ingredients used to make the food; Champion does not add heavy metals to its dog food. Declaration of Gayan Hettiarachchi, ("Hettiarachchi Dec."), attached hereto as Exhibit 10, at ¶¶ 8-9.

41. Nearly all foods, whether for humans or pets, contain some levels of heavy metals. FDA, *Total Diet Study Elements Results Summary Statistics: Market Baskets 2006 through 2013* (rev. 2017) (April 15, 2014), https://www.fda.gov/media/77948/download; *Weaver v. Champion Petfoods USA Inc.*, No. 18-CV-1996-JPS, 2019 WL 2774139, at *3 (E.D. Wis. July 1, 2019).

42. In 2005, the NRC published a study in the Mineral Tolerance Animals, 2nd Revised Edition, 2005, that provided maximum tolerable limits ("MTLs") for arsenic, cadmium, lead, and mercury. Poppenga Dec. Ex A at 14.

43. In 2011, the FDA conducted its own review of the levels of heavy metals in pet food entitled the Target Animal Safety Review and adopted the MTLs utilized by the NRC in the Mineral Tolerance of Animals, namely (1) Arsenic 12,500 µg/kg (12.5 mg/kg); (2) Cadmium 10,000 µg/kg (10 mg/kg); (3) Lead 10,000 µg/kg (10 mg/kg); and (4) Mercury 267 µg/kg (.27 mg/kg). Poppenga Dec. Ex. A at 14.

44. In 2002, the European Union promulgated regulations for the safe upper limits of total arsenic (10 mg/kg), cadmium (2 mg/kg), mercury (.3 mg/kg), and lead (10 mg/kg) in pet foods. Poppenga Dec. Ex. A at 15-16.

45. The levels of heavy metals in Champion's dog food—whether one takes the testing Champion performed in the ordinary course of its business or the testing performed by the Plaintiff—are below the MTLs set by the NRC/FDA, and also below the EU safety standards for heavy metals in pet food. Poppenga Dec. Ex. A at 17-24.

46. Dr. Robert Poppenga concluded "the levels of naturally occurring heavy metals in ACANA and ORIJEN dog food diets do not present a health risk to dogs." Poppenga Dec. Ex. A at 35.

47. Plaintiff's expert did not identify any known safety standard or guidelines applicable to canines or to dog food that Champion's dog food exceeds. Deposition of Gary Pusillo on April 26, 2019 ("Pusillo Dep. Vol. 1"), attached hereto as Exhibit 11, at 11:21-12:22; 13:21-14:12; 31:4-8; Deposition of Gary Pusillo on May 31, 2019 ("Pusillo Dep. Vol. 2"), attached hereto as Exhibit 12, at 86:8-17; 93:5-18; 94:4-12. Plaintiff's expert is not a pet food safety expert or a toxicologist. Pusillo Dep. Vol. 1 36:23-37:5; 130:6-14; 143:22-24; Pusillo Dep. Vol. 2 67:21-23.

48. Bisphenol-A (BPA) is a chemical molecule that is produced for use primarily in the production of polycarbonate plastics and epoxy resins. Poppenga Dec. Ex. A at 25.

49. Polycarbonate plastics and epoxy resins frequently appear in water bottles, infant bottles, CDs, medical devices, and lacquers to coat products such as food cans and bottle tops. Poppenga Dec. Ex. A at 25.

50. Humans and animals are most commonly exposed to BPA through their diet, as BPA tends to leach into food and liquid. Poppenga Dec. Ex. A at 25-26.

51. BPA is also prevalent in the environment, and many studies have measured levels of BPA in our air, dust, and water. Poppenga Dec. Ex. A at 25.

52. Given BPA's ubiquitous presence in our environment, humans and animals are exposed to BPA daily through a variety of pathways. Poppenga Dec. Ex. A at 25, 35.

53. Champion does not add BPA as an ingredient during its making of its dog food. Hettiarachchi Dec. at ¶ 10. None of Champion's packaging for ORIJEN Regional Red or ORIJEN Six Fish states that its dog food is "BPA free," or words to that effect. Ogbonna Dec. at ¶¶ 9-10, Ex. A-D; Weaver Dep: 88:4-7.

54. Ellipse Analytics, which has been engaged by Plaintiff, utilized a 30 ppb Level of Quantification ("LOQ") testing criteria and found that a third of several hundred dog foods tested had BPA in them. Deposition of Sean Callan ("Callan Dep."), attached hereto as Exhibit 13, at 54:10-15; 55:4-8. Mr. Callan testified that he would have found more dog foods with BPA in it if he used a more sensitive test. *Id.* at 59:11-16.

55. Eurofins laboratory tested five samples of the Regional Red and Six Fish diets purchased by the Plaintiff utilizing a five parts per billion (ppb) LOQ for BPA. Poppenga Dec. Ex. A at 27. Each test demonstrated that the amount of BPA, if any, was non-detectable as it was below the five ppb level of detection. *Id.*

56. Champion tested other dog food brands for BPA. Poppenga Dec. Ex. A at 28. These brands also had low levels of BPA similar to (if not greater than) Champion. *Id.* at 27-28.

57. The levels of BPA, purportedly in Champion's dog food according to the TAC, would not cause an adverse effect in a dog. Poppenga Dec. Ex. A at 35.

58. One of the laboratories utilized by Plaintiff to test for BPA and plasticizers, ExperTox, did not detect any BPA in any of the 38 samples of Champion's dog food it tested. Pusillo Dep. Vol. 1: 19:15-17; 21:11-18; 43:2-5; 124:9-13; Vol. 2 111:16-112:1.

59. Both of Plaintiff's experts, Dr. Pusillo and Sean Callan, did not opine on what levels of BPA would be harmful to dogs. Pusillo Dep. Vol. 1. 26:12-16; 108:22-109:1; Pusillo Dep. Vol. 2. 112:5-13; Callan Dep. 84:17-85:18. Plaintiff's expert, Dr. Pusillo, is not a BPA expert and gave no opinion on the source of BPA (*i.e.* how it could have come to be present) in Champion's dog food. Pusillo Dep. Vol. 1. 15:11-12; 15:14-16; 15:22-25.

60. Plaintiff's expert, Gary Pusillo, had testing done that detected trace levels of phthalates in Champion's dog food, but he had no opinion about what a dangerous level of phthalates would be, and conceded he is not an expert in phthalates or as to plastics. Pusillo Dep. Vol. 1. 16:9-20; 108:22-109:1; 129:20-21; Pusillo Dep. Vol. 2 112:14-24.

61. Champion uses beef tallow (fat) as an ingredient in its beef-based ("Red") dog food diets. Milam Dec. at ¶ 16. Beef tallow is created through a process called "rendering." Milam Dec. at ¶ 17. During the rendering process, the fatty tissue of a healthy slaughtered animal, such as a cow, gets converted into a purified fat, such as lard or tallow. *Id.*

62. Champion's ingredient specifications to its suppliers of beef tallow require that all beef tallow sold to Champion is rendered from EU Category 3 cows, with no dead, dying, or condemned euthanized animals allowed. Deposition of Kenneth Gilmurray ("Gilmurray Dep."), attached hereto as Exhibit 14 at 180:14-19; 181:1-11; 186:25-189:7; 247:6-248:12; Gilmurray Dep. Ex. 18 ("EU certified, category 3. Product shall not contain animals dead or condemned upon reaching the slaughter facility. Product shall be from animals deemed fit for human consumption, and consist of meat, organ and bone."); Ex. 19.

63. JBS is one of three companies that supplied shipments, called "lots," of beef meal and/or beef tallow to Champion between August 2016 and May 2018. Milam Dec. at ¶ 21; Gilmurray Dep. 226:14-16.

64. On or about May 7, 2018, Champion learned that two JBS lots of beef tallow (from its Pennsylvania MOPAC rendering facility) delivered to Champion on or around March 26, 2018 and March 28, 2018, contained small amounts of pentobarbital. Gilmurray Dep. 42:8-43:4; 218:2-5; Gilmurray Dep., Ex. 21. Pentobarbital is not an ingredient in Champion's dog food. Milam Dec. at ¶ 22; Hettiarachchi Dec. at ¶ 11.

65. At an in-person meeting, JBS explained that the Pennsylvania Department of Agriculture had inspected the MOPAC rendering facility and took samples to test. Gilmurray Dep. 220:5-8; 221:11-222:9. Two of the five samples (at 56 ppb and 16 ppb, respectively) came from lots of beef tallow that had been shipped to Champion's DogStar Kitchen. Gilmurray Dep. 218:6-10; 222:6-9; Gilmurray Dep., Ex. 21.

66. Champion analyzed which of its production runs (also called "lots") used the affected beef tallow and quarantined all unused portions of the affected beef tallow, along with any other MOPAC product in its possession and all unshipped kibble made with the affected beef tallow. Deposition of Jim Wagner ("Wagner Dep."), attached hereto as Exhibit 15 at 131:14-18; 133:9-12. Champion also pulled back from its distributors all of the food that used the affected beef tallow they had in their possession. *Id.* at 131:16-18.

67. Of the 1.7 million pounds of dog food manufactured using the affected beef tallow, approximately 1.6 million was retrieved by Champion and only about 100,000 pounds was sold into retail. Wagner Dep. 131:14-18. It is not known if any of that product was sold in Wisconsin. Flakstad Dep. 72:20-21; 80:9-15; 113:16-114:9.

68. Champion retained a consultant, Exponent, to assess whether the 100,000 pounds of dog food from the affected lots would pose a risk to dogs. Hettiarachchi Dep. ¶ 18, Ex. A. Due to the low amount of pentobarbital in the affected tallow, as well as that fact that tallow is only a small fraction of the finished food, Exponent determined, using the FDA's No Observable Effect Level (NOEL), that the amount of pentobarbital in the beef tallow used in the affected lots would not pose any danger to any dog. *Id.*

69. As a matter of course, approximately every 2 hours, during Champion's operational production times, Champion collects about an 18-ounce sample from each of its production runs.. Hettiarachchi Dec. at ¶ 13. Champion determined that it had run only 6 production runs, comprised of 11 production shifts, with the affected beef tallow. *Id.* ¶ 14. Champion took approximately 4.5 to 6 ounce samples out of every 18-ounce 2-hour sample that was collected during the 11 production shifts. *Id.* ¶ 15; Wagner Dep. 49:12-15. Champion then mixed those samples to create 11 individual properly mixed and homogenized composite 18-ounce samples, which were representative of the 11 production shifts. *Id.* ¶ 16; Wagner Dep. 49:1-2; 50:3-9.

70. These eleven (11) composite samples were then sent to Texas A&M Veterinary Medical Diagnostic Laboratory ("TVMDL") for testing. Hettiarachchi Dec. at ¶ 15; Wagner Dep. 48:22-23; 49:1-2. All eleven (11) composite samples tested by TVMDL resulted in a "Non-Detect" reading by its lab equipment with a 2 ppb Level of Detection ("LOD"). Deposition of Travis Mays ("Mays Dep."), attached hereto as Exhibit 16, Ex. 7. Plaintiff has no testing to the contrary. Callan Dep. 135:20-24; 137:1-10.

71. Travis Mays, the Section Head of Analytical Chemistry at TVMDL, testified that although an ingredient used in manufacturing Champion dog food contained some amount of pentobarbital, pentobarbital will not necessarily be present in Champion's finished dog food

product because that is dependent on the amount of pentobarbital present in the ingredient and the prevalence of that ingredient in the dog food. Mays Dep. 105:9-106:3.

72. As a result of the risk assessment and non-detect test results, Champion determined that it would not recall its products made with the affected tallow that had been shipped to retailers because the finished dog food posed no danger to dogs. Wagner Dep. 47:15-21; 48:12-17; 52:20-24.

73. The Federal Food and Drug Administration (FDA) inspected Champion's DogStar Kitchen over three days on or around May 16th, 17th, and 23rd of 2018. Wagner Dep., Ex. 4. After inspecting Champion's facilities and reviewing Texas A&M's test results, the FDA (i) approved of Champion's handling of the situation, including Champion's decision not to recall products from retailers, (ii) determined no other action needed to be taken, and (iii) issued a no action letter. Wagner Dep. 33:5-34:12, 53:20-54:12, 84:14-23, Ex. 4.

74. The FDA issued a guidance relating to pentobarbital that stated, it is "the **detection** of pentobarbital in pet foods [that] renders the product adulterated." FDA, *Questions and Answers: Evanger's Dog and Cat Food* (webpage archived on Feb. 7, 2019 at 19:57) https://wayback.archive-it.org/7993/20190207195700/https://www.fda.gov/AnimalVeterinary/NewsEvents/ucm544348.htm (last accessed August 14, 2019), attached hereto as Exhibit 17. In response to a frequently asked question regarding whether there is any acceptable level of pentobarbital in pet food, the FDA reiterated its position that "its **detection** renders the product adulterated." *Id.*

75. Canine dilated cardiomyopathy ("DCM") is a disease of cardiac muscle in dogs that results in a decreased ability of the heart to generate pressure to pump blood through the vascular system. FDA, *FDA Investigating Potential Connection Between Diet and Cases of Canine Heart*

*Disease* (July 12, 2018), https://www.fda.gov/animal-veterinary/cvm-updates/fda-investigating-potential-connection-between-diet-and-cases-canine-heart-disease.

76. On July 12, 2018, the U.S. Food & Drug Administration ("FDA") issued a report that it was investigating reported cases of DCM in dogs eating certain pet foods containing peas, lentils, other legume seeds, or potatoes. FDA, *FDA Investigating Potential Connection Between Diet and Cases of Canine Heart Disease* (July 12, 2018), https://www.fda.gov/animal-veterinary/cvm-updates/fda-investigating-potential-connection-between-diet-and-cases-canine-heart-disease. The FDA updated its report in February of 2019 and stated it was continuing to "collect and evaluate information about the DCM cases." FDA, *FDA Provides Update on Investigation into Potential Connection Between Certain Diets and Cases of Canine Heart Disease* (Feb. 19, 2019), https://www.fda.gov/animal-veterinary/cvm-updates/fda-provides-update-investigation-potential-connection-between-certain-diets-and-cases-canine-heart.

77. The February update also stated that "[a] large proportion of the reported diets in DCM cases – both grain-free and grain-containing – contained peas and/or lentils in various forms (whole, flour, protein, etc.) as a main ingredient (listed within the first 10 ingredients, before vitamins and minerals)." FDA, *FDA Provides Update on Investigation into Potential Connection Between Certain Diets and Cases of Canine Heart Disease* (Feb. 19, 2019), https://www.fda.gov/animal-veterinary/cvm-updates/fda-provides-update-investigation-potential-connection-between-certain-diets-and-cases-canine-heart.

78. On, June 27, 2019, the FDA issued a report in which it listed Champion (ACANA and ORIJEN), along with many other brands, as a diet a dog had been fed prior to being diagnosed with DCM. FDA, *FDA Investigation into Potential Link between Certain Diets and Canine Dilated*

*Cardiomyopathy* (June 27, 2019), https://www.fda.gov/animal-veterinary/news-events/fda-investigation-potential-link-between-certain-diets-and-canine-dilated-cardiomyopathy.

79. In the report, the FDA stated that it "strives to learn more about this emergence of DCM and its potential link to certain diets or ingredients." FDA, *FDA Investigation into Potential Link between Certain Diets and Canine Dilated Cardiomyopathy* (June 27, 2019), https://www.fda.gov/animal-veterinary/news-events/fda-investigation-potential-link-between-certain-diets-and-canine-dilated-cardiomyopathy. The FDA also stated it will "continue to investigate this potential association. Based on the data collected and analyzed thus far, the agency believes that the potential association between diet and DCM in dogs is a complex scientific issue that may involve multiple factors." *Id*.

80. The FDA issued no recall of any kind, did not restrict the manufacturers of grain free dog food, and did not advise consumers to discontinue feeding such foods to their dogs. The FDA informed consumers that it "is continuing to investigate and gather more information in an effort to identify whether there is a specific dietary link to the development of DCM." FDA, *FDA Investigation into Potential Link between Certain Diets and Canine Dilated Cardiomyopathy* (June 27, 2019), https://www.fda.gov/animal-veterinary/news-events/fda-investigation-potential-link-between-certain-diets-and-canine-dilated-cardiomyopathy.

81. The February and June FDA updates also stated that "[a] large proportion of the reported diets in DCM cases – both grain-free and grain-containing – contained peas and/or lentils in various forms (whole, flour, protein, etc.) as a main ingredient (listed within the first 10 ingredients, before vitamins and minerals)." FDA, *FDA Provides Update on Investigation into Potential Connection Between Certain Diets and Cases of Canine Heart Disease* (Feb. 19, 2019), https://www.fda.gov/animal-veterinary/cvm-updates/fda-provides-update-investigation-potential-

connection-between-certain-diets-and-cases-canine-heart; FDA, *FDA Investigation into Potential Link between Certain Diets and Canine Dilated Cardiomyopathy* (June 27, 2019), https://www.fda.gov/animal-veterinary/news-events/fda-investigation-potential-link-between-certain-diets-and-canine-dilated-cardiomyopathy. In the ORIJEN Six Fish diet, peas are the 14th most abundant ingredient, and in the ORIJEN Regional Red diet, peas are the 16th most abundant ingredient. Ogbonna Dec. at ¶¶ 9-10, Ex. A, C.

82. Plaintiff bases his damages for each of his claims on an expert's calculation of the difference between Champion's actual sales and the sales that would have been made but for the alleged misrepresentations. Deposition of Colin Weir ("Weir Dep."), attached hereto as Exhibit 18 at 93:6-95:11. That calculation is based entirely on a "diminution in value" figure attained through a consumer survey. *Id.*; 76:15-20. The first consumer survey, conducted by Dr. Jon Krosnick and produced on April 8, 2019, purports to measure the effect on the price of Champion's dog food premised upon eight[2] "corrective statements," which Plaintiff claims are necessary to correct the purported misrepresentations and omissions upon which he premises his claims. Expert Report of Dr. Jon Krosnick ("Krosnick Report"), attached hereto as Exhibit 19 at 41-42.

83. The "corrective statements" were drafted by Plaintiff's counsel. Deposition of Dr. Jon Krosnick ("Krosnick Dep."), attached hereto as Exhibit 20 at 20:7-14; 90:19-91:3.

84. The eight "corrective statements" are:

> (1) Laboratory testing has shown there is a risk that this food may contain mercury. The World Health Organization has said that in humans, "Mercury may have toxic effects on the nervous, digestive and immune systems, and on lungs, kidneys, skin and eyes."

---

[2] Dr. Krosnick's first survey utilizes the eight "corrective statements" listed in Paragraph 84 herein. *See also* Krosnick Report at 41-42. Dr. Krosnick produced a second survey on August 13, 2019, which asked consumers for their impressions on the quality and healthiness of the products based on two statements regarding pentobarbital. Krosnick Report at 372. However, Dr. Krosnick does not premise any diminution of value from the results of this second survey.

> (2) Laboratory testing has shown there is a risk that this food may contain cadmium. A federal public health agency of the U.S. Department of Health and Human Services, has found, "Kidney and bone effects have also been observed in laboratory animals ingesting cadmium. Anemia, liver disease, and nerve or brain damage have been observed in animals eating or drinking cadmium."
>
> (3) Laboratory testing has shown there is a risk that this food may contain lead. The Food & Drug Administration has said, "Lead is poisonous to humans and can affect people of any age or health status."
>
> (4) Laboratory testing has shown there is a risk that this food may contain arsenic. The Environmental Protection Agency has said, "Arsenic has been linked to a number of cancers. These include cancer of the bladder, lungs, skin, kidney, nasal passages, liver, and prostate."
>
> (5) Laboratory testing has shown there is a risk that this food may contain BPA. The Food & Drug Administration has said, "BPA is an industrial chemical used to make polycarbonate, a hard, clear plastic, which is used in many consumer products."
>
> (6) The manufacturer of this food has stated that it may include ingredients that are not are delivered to them fresh but have been frozen before they are used to make the dog food.
>
> (7) The manufacturer of this food has stated that it may include ingredients that are sourced outside the region where it is manufactured. This may include not only other regions within the United States but also other regions internationally.
>
> (8) The manufacturer of this food has stated that it uses third parties to process and manufacture protein meals and tallows used in its dog foods.
>
> Krosnick Report at 42-43.

85. Part one of Dr. Krosnick's survey utilizes the DogStar ORIJEN Six Fish and ACANA Duck and Pear packaging. Krosnick Report at 38.

86. Dr. Krosnick did nothing "to understand how respondents interpreted any of the context that Champion [] put on the product." Krosnick Dep. 126:21-24. As to Biologically Appropriate, he testified:

> Q. Similarly, there's nothing about your survey that asked the respondents if they attached any meaning or significance to the expression "Biologically Appropriate"?
>
> A. Correct.

Q. Okay. As a result of your experiment, did you form any opinions about the relative importance of any of the content of Champion's packages?

A. No.

Krosnick Dep. 127:5-9; 127:12-15.

87. The American Association of Feed Control Officials ("AAFCO") AAFCO provides a forum for state regulatory officials to come together and create model guidelines to ensure that the regulation of animal feeds is as uniform as possible from state to state. Ogbonna Dec. at ¶ 6. While most states follow AAFCO model regulations, exact language and interpretation may differ among states. *Id.* Champion strives to create product labels for distribution in the United States that are consistent with AAFCO Model Regulations. *Id.*

88. AAFCO defines "raw" as "food in its natural or crude state not having been subjected to heat in the course of preparation of food." Ogbonna Dec. at ¶ 13, Ex. E. Champion's raw ingredients are "fresh frozen." Milam Dec. at ¶ 11; Declaration of Richard Raposo ("Raposo Dec."), attached hereto as Exhibit 21, at ¶¶ 9, 12.

89. AAFCO regulations state that when a pet food represents that it is "made with" certain ingredients, those ingredients must constitute at least 3% of the product weight. Ogbonna Dec. at ¶ 14, Ex. F.

90. As required by AAFCO regulations, the back of every package of Champion dog food has an ingredients panel that lists all ingredients included in the dog food, in order of weight. Ogbonna Dec. at ¶ 15.

91. For the NorthStar Six Fish diet, the regional wild-caught saltwater fish come from the Pacific Ocean and are sourced from Keltic Seafood Ltd. in the Port Hardy, British Columbia, Canada, and the freshwater fish come from lakes located in the Canadian Provinces and are sourced from Freshwater Fish Co. in Winnipeg, Manitoba, Canada. Raposo Dec. at ¶¶ 13-14.

92. For the DogStar Six Fish diet, the wild-caught fish come from the Atlantic Ocean and are sourced from Norpel in New Bedford, Massachusetts and came from the Atlantic Ocean, just east of New England. Milam Dec. at ¶ 24.

93. Plaintiff testified he knew the fish ingredients in the DogStar Six Fish diet were sourced from New England in the Atlantic Ocean. Weaver Dep. 84:7-16.

94. For the NorthStar Regional Red diet, "the Regional Red Meats" such as angus beef, wild boar, and heritage pork are sourced from ranches in Alberta, Canada, while the lamb is sourced from Alberta, Canada, as well as, New Zealand when Canadian supply is low, and the free-range bison is sourced from ranches in Alberta Canada, as well as ranches in Colorado when the Canadian supply is low. Raposo Dec. at ¶¶ 15-20.

95. For the DogStar Regional Red diet, the angus beef ingredients were sourced by Darling Ingredients, Inc. in Nebraska, and were sent for processing in Paduka, Kentucky; the lamb, mutton, and goat ingredients were sourced from farms in Kentucky and Indiana, and ranches in New Zealand; the pork ingredients were sourced by Indiana Packers, Corp. from farmers in Kentucky and Indiana; the catfish ingredients were sourced by Darling Ingredients, Inc. from freshwater sources in Kentucky. Milam Dec. at ¶¶ 25-26; 29-30.

96. Champion is not a ranch, slaughterhouse, renderer, fishing operation, farm, or any kind of ingredient producer. Milam Dec. at ¶ 31. The beef and other protein meals and tallow ingredients are ingredients made by a third-party renderer for Champion. *Id*. at ¶ 23.

97. Champion does not outsource the making of its finished food products. Raposo Dec. at ¶¶ 22-23; Milam Dec. at ¶¶ 33-34.

Dated: August 15, 2019

Respectfully submitted,

By: *s/ Susan E. Lovern*
Susan E. Lovern, SBN 1025632
Mark E. Schmidt, SBN 1052450
Derek J. Waterstreet, SBN 1090730
von BRIESEN & ROPER, s.c.
411 East Wisconsin Avenue
Suite 1000
Milwaukee, Wisconsin 53202
Telephone: (414) 287-1286
Facsimile: (414) 238-6599
E-mail: slovern@vonbriesen.com
mschmidt@vonbriesen.com
dwaterstreet@vonbriesen.com

*s/ David A. Coulson*
David A. Coulson
Florida Bar No. 176222 (admitted to E.D. Wis.)
GREENBERG TRAURIG, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0754
Facsimile: (305) 579-0717
Email: coulsond@gtlaw.com

***Attorneys for Defendants Champion Petfoods USA Inc. and Champion Petfoods LP***